**Date Signed:**
**October 24, 2023**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>BOTEILHO HAWAII ENTERPRISES, INC.,<br><br>Debtor. | Case No.: 22-00827<br>Chapter 11<br><br>Related: ECF 83 |

### MEMORANDUM OF DECISION ON CONFIRMATION OF PLAN UNDER CHAPTER 11 SUBCHAPTER V

The question presented is whether the subchapter V plan filed by debtor Boteilho Hawaii Enterprises, Inc. ("BHE"), satisfies the so-called "best interests of creditors" test under § 1129(a)(7)(A)(i).[1] Based on the evidence, I hold that it does.

---

[1] Unless otherwise indicated, all citations to sections refer to provisions of the Bankruptcy Code, 11 U.S.C.

BHE filed its plan on February 21, 2023. (ECF 83). Creditors Kees Kea, Mauna Kea Moo, LLC, and Dutch-Hawaiian Dairy Farms, LLC (collectively the "Kea Parties") filed objections to confirmation of the plan. (ECF 106). The court held initial hearings on June 14 and June 26, 2023, and an evidentiary hearing on October 18 and 19, 2023. Chuck C. Choi, Esq. and Allison A. Ito, Esq. represented BHE and Frederick J. Arensmeyer, Esq. represented the Kea Parties.

**LEGAL ISSUE AND STANDARD**

Sections 1191 and 1129 provide that the court may confirm a plan under subchapter V of chapter 11 ("subV") only if it meets numerous requirements. The Kea Parties' objection pertains to only one of those requirements – the "best interest of creditors" test under § 1129(a)(7)(A)(i) – and I find and conclude that all other requirements are satisfied.

Section 1129(a)(7) provides that the court shall confirm a plan only if:

> With respect to each impaired class of claims or interests--
> **(A)** each holder of a claim or interest of such class--
> **(i)** has accepted the plan; or
> **(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than

2

> the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

A claim is "impaired" unless the plan "leaves unaltered the legal, equitable and contractual rights" of the claimant (other than curing defaults and reinstating the claim). § 1124. BHE's plan provides that nonpriority unsecured claims, such as the claims of the Kea Parties, will receive no distribution and will be discharged. (ECF 83 at 2). Therefore, the Kea Parties' claims are impaired. The Kea Parties have not accepted the plan. (ECF 110 at 3).

To satisfy the best interests of creditors test, the court looks at a hypothetical chapter 7 liquidation. *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). A hypothetical liquidation "entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *Id.* The analysis must be based on evidence but "is, by nature, inherently speculative and is often replete with assumptions and judgments." *In re PC Liquidation Corp.*, 383 B.R. 856, 868 (E.D.N.Y. 2008).

The hypothetical chapter 7 trustee who would conduct the hypothetical liquidation would have to comply with a chapter 7 trustee's statutory duties and powers. 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7](b)(iii) (Richard Levin & Henry J. Sommer eds., 16th ed.). These provisions mean that chapter 7 trustees often must sell property for less than the amount that a private, solvent seller could realize.

The chapter 7 trustee's first duty is to liquidate the estate's property "as expeditiously as is compatible with the best interests of parties in interest." § 704(a)(1). The chapter 7 trustee uses his or her business judgment when disposing of the assets; "[a]lthough a trustee is not compelled to accept any offer to purchase, solely because 'some recovery is better than none at all,' a trustee is required to take appropriate action to liquidate the assets of the estate." *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990). In other words, the trustee must always dispose of the property quickly (although not necessarily at "fire sale" prices).

If selling the property is impossible or disadvantageous, the trustee's only option is to abandon the property under § 554. This means that, unlike

4

a normally motivated private seller, the trustee must either sell the property promptly or give it away for free.

A private party selling business assets may decide to continue operating the business while marketing the assets. A chapter 7 trustee, however, may only operate a business (1) with the court's approval, (2) "for a limited period," and (3) "if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." § 721. Chapter 7 trustees rarely seek and obtain court approval to operate a business. *See In re Quarter Moon Livestock Co., Inc.*, 116 B.R. 775, 782 (Bankr. D. Idaho 1990).

A private seller of assets may decide to spend money, and borrow money if necessary, to improve or rehabilitate the assets in an effort to increase the sale price. But a chapter 7 trustee that is not authorized to operate a business can obtain credit only with court approval. § 364. And, of course, a trustee can borrow money only if the trustee can find a lender who is willing to extend credit to a chapter 7 trustee.

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 197   Filed 10/24/23   Page 5 of 17

## FACTUAL BACKGROUND

BHE operates a dairy farm and a beef cattle ranch at two separate locations on Hawaii island. BHE leases both locations from the State of Hawaii Department of Agriculture.

The lease of the dairy farm provides that the lessee may use the property solely for "dairying and allied uses." The term of the lease ends in 2041. (ECF 56-2 at 10).

BHE's dairy property is improved with farm buildings and a few dwellings that house its employees. BHE's facilities and equipment are outdated and in dilapidated condition. Its dairy herd includes about 1,100 animals, most of which are in poor to fair condition. BHE has bred the herd using its own bulls. BHE has not used artificial insemination or any selective breeding techniques. As a result, BHE's herd has become inbred, has less genetic diversity than is desirable, and is less valuable as a result.

The lease of the cattle ranch similarly limits the lessee's use to cattle ranching:

> "Pasture" shall mean the conduct of livestock operation
> consisting of the keeping primarily of cattle, and others, in a

6

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 197   Filed 10/24/23   Page 6 of 17

>       minor role, such as horses and sheep wherein the animals graze the land for feed produced thereon. Permitted use shall include such compatible uses as woodland management, wildlife management and the cultivation of feed crops to be used strictly within the premises. Excluded will be the operation of commercial activities such as feedlots (excepting a private feedlot designed to feed the Lessee's own cattle), dairy milking parlors, or boarding of horses.

(ECF 56-3 at 83). The lease precludes the lessee from assigning the lease or subleasing without the lessor's consent and provides that the lessor can increase the rent if it approves an assignment or sublease. The lease term ends in about seven years.

The ranch property is largely unimproved. BHE's beef herd of about 1,100 animals is in poor to fair condition and lacks appropriate genetic diversity.

BHE has experienced financial difficulties for many years due to changes in milk pricing, increased competition from milk produced on the continent, increased costs of feed and other supplies, and a prolonged drought that has reduced the amount of forage grown on BHE's properties. BHE's owners began attempting to sell the business in 2010. Those attempts were unsuccessful for many years.

7

In 2020, BHE agreed to sell its dairy operation (including the dairy lease, equipment, and cattle) to the Kea Parties for $700,000. That transaction never closed. (The reasons for the transaction's failure are disputed.)

In the fall of 2022, Bahman Sadeghi bought 85% of the stock in BHE for $600,000. He provided financial support to BHE by buying a $463,926 judgment that a feed supplier had recovered against BHE and advancing $200,000 to BHE as working capital.

BHE filed its bankruptcy petition in December 2022. BHE rejected the purchase contract under § 365, so the Kea Parties no longer have the right to purchase the dairy (although they retain claims for money damages on account of BHE's deemed breach of the agreement). With court approval, Mr. Sadeghi has lent BHE $1 million.

Despite these infusions and a grant of about $52,000 from the U.S. Department of Agriculture, BHE suffered losses of about $437,000 from December 2022 through May 2023, or $87,000 per month. BHE has doubtless incurred additional losses since then.

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 197   Filed 10/24/23   Page 8 of 17

## LEGAL STANDARD APPLIED TO FACTS

*Senior Claims*

Before nonpriority unsecured creditors could receive any distribution, all secured, administrative, and priority claims would have to be paid in full. I find that, in the hypothetical chapter 7 liquidation, senior claims in the following amounts would be paid before there could be any distribution to claims like those of the Kea Parties:

| Priority Claims | Amount |
|---|---|
| Hawi Dairy Acquisition | $ 206,939.84 |
| Logix Capital | $ 200,000.00 |
| DIP Loan | $ 1,000,000.00 |
| **Administrative Claims** | |
| Ch. 7 Trustee Fee | $ 113,458.20 |
| Ch. 7 Trustee's Professionals | $ 50,000.00 |
| Adversary Proceeding | $ 25,000.00 |
| Ch. 11 Professionals | $ 325,000.00 |
| Tax on Sale of Cattle | $ 270,000.00 |
| Priority Tax Claims | $ 2,500.00 |
| Priority Employee Claims | $ 7,575.00 |
| **Total:** | $ 2,200,473.04 |

The Kea Parties dispute only one of these items. Gary Genske, a certified public accountant with impressive experience and expertise in the dairy industry, opined that there would be no income tax consequences

9

from a liquidation of the herds if the sale were "done right." He offered no further explanation. BHE believes that its tax basis in the animals is zero because BHE did not purchase any of the animals and the cost of breeding and raising the animals was treated as an operating expense. Therefore, BHE believes that all sales proceeds of the capital would be taxable income. This explanation is convincing, and I accept it for purposes of this analysis.

*The Dairy Assets*

I find that $700,000 is the maximum amount that a chapter 7 trustee could likely realize for the dairy operation, including the dairy lease, the related improvements and equipment, and the dairy herd.

$700,000 is the price that the Kea Parties agreed to pay for those assets, and that BHE agreed to accept, in 2020. The price set by two parties acting at arms' length is strong evidence of value. Although the agreement was made several years ago, it is nearly inconceivable that the assets have gained value since then: the remaining term of the lease is shorter; the buildings and equipment are older and in worse condition; and the drought and inbreeding continue to erode the value of the herd.

10

Both parties have offered evidence about a possible sale of the dairy animals on the continent. I find that a chapter 7 trustee probably could not accomplish such a sale. In order to do so, the trustee would have to pay the cost of shipping the animals to the mainland. The evidence shows that shipping the animals from Hawaii island to the continent would cost at least 51 cents per pound. (This probably does not include the cost of moving the animals from BHE's property to the port or airport at the point of shipment and from the port or airport at the point of arrival to the place of sale.) Assuming that the animals weigh 500 pounds each on average, the total cost of shipping 2,200 animals would be $561,000.[2] Based on my experience, I find that the shipper would probably require a chapter 7 trustee to pay the freight in advance.[3] As of the end of August 2023, the estate's cash on hand was only about $68,000. The cash balance has surely dwindled since then. Therefore, the hypothetical chapter 7 trustee simply would not have enough cash to sell the animals on the mainland.

---

[2] The average weight of the animals is disputed. Even if the animals weighed only 100 pounds each on average, the cost of shipment would exceed the cash available to the trustee.

[3] There was no evidence that a mainland buyer would be willing to take delivery of the animals in Hawaii or pay or advance the freight costs before delivery.

11

Mr. Yamamura offered opinion testimony that the fair market value of the dairy lease alone was $1,150,000 as of March 30, 2020. I respectfully disagree with his opinion for the following reasons.

First, over three years of the lease term have expired since the effective date of the appraisal. Everything else being equal, a reduction in the remaining term of a lease reduces the value of the lease. There is no evidence of any circumstances in this case that would offset this effect.

Second, Mr. Yamamura prepared his appraisal in connection with the Kea Parties' request for a loan to finance their purchase of the dairy assets. But the appraisal acknowledges that BHE agreed to sell all the dairy assets, not just the lease, for $700,000. The appraisal does not explain how the lease by itself could be worth more than a package of assets that includes the lease and other items.

Third, the appraisal relies primarily on the "income capitalization approach" which "requires the estimation of revenues and expenses from which net income is derived" and then capitalizes the stream of net income to arrive at a valuation. (ECF 143-1 at 27). Yet the appraisal contains no

12

information about the revenues and expenses of the property. Instead, the appraisal (1) estimates the value of the fee simple interest in the property (by looking at comparable sales of other fee simple properties), (2) estimates the fair market rental value of the property by applying a percentage to the fee simple value, (3) subtracting the contract rent from the estimated fair market rent (the "bonus rent"), and (4) calculating the net present value of the bonus rent. This calculation has nothing to do with the actual revenue or actual expenses of operating the property under the terms of the lease. The lessee could only realize the "bonus rent" if it were able to sublet the property at the estimated fair market rent. The dairy lease provides that BHE may not sublease the property without the State's consent, and in the event the lessee subleases the property, the State may revise the rent upwards.

Fourth, and perhaps most importantly, the appraisal represents the appraiser's opinion of the "market value" of the leasehold, "assuming that neither [the buyer nor the seller] is under undue duress." (ECF 143-1 at 6). As I have explained above, the law basically forces a chapter 7 trustee to

13

sell quickly. A definition of market value that assumes no "undue duress" is not a good fit.

*The Minor Assets*

BHE's liquidation analysis includes as an asset a claim for attorneys' fees against the Kea Parties. For purposes of this analysis, I attribute no value to this claim. The evidence does not permit me to determine, or even predict reliably, whether BHE or the Kea Parties defaulted under the 2020 purchase agreement, or whether BHE could collect an award if it prevailed.

Mr. Genske opined that the liquidation analysis should treat as an asset a $200,000 bond or cash deposit that BHE pledged to its landlord, the Department of Agriculture. I find that, for purposes of this analysis, the bond should not be treated as an asset. The trustee could recover the bond only if the trustee were able to avoid a default under the leases. In light of the minimal cash reserves and continuing massive losses, the trustee may not be able to do so. Even if the trustee were able to sell both leases, a buyer would likely reduce its price to reflect the deposit that it would have to pay.

*The Ranch Assets*

In order to generate any return for the Kea Parties and other nonpriority unsecured creditors, the chapter 7 trustee would have to sell the ranch assets for at least $1,500,473.04 (which is equal to the senior claims of $2,200,473.04 minus the $700,000 value of the dairy assets). I find that the hypothetical chapter 7 trustee would not be able to achieve that result.

The evidence of the value of the ranch assets is thin. For the reasons set out above, I find that the chapter 7 trustee could not afford to sell the beef herd on the mainland. Only seven years remain on the ranch lease. BHE has tried to sell its assets, including the ranch assets, since 2010 without success.

The most specific evidence of the value of the ranch assets is Mr. Genske's testimony that the ranch property has a "feed value" of $1 million. According to Mr. Genske, the grass growing on the ranch is worth about $1 million per year. I find, however, that a chapter 7 trustee probably could not realize this value. The trustee or a buyer of the lease could not

15

harvest and sell the feed to someone else for at least two reasons. First, the ranch lease permits "the cultivation of feed crops *to be used strictly with the premises.*" (ECF 56-3 at 83) (emphasis added). Second, most of the ranch terrain is too rough to permit harvesting of the grass. Therefore, the grass on the ranch is probably valuable only to the lessee under the lease. Any sale or sublease of the ranch lease to another rancher would require the Department of Agriculture's consent and there is no evidence about the likelihood that the department would grant its consent. Even if BHE successfully transferred the lease, the Department of Agriculture has the right to adjust the rent to market rate in the event of an assignment, meaning a sale might not result in any bonus value in the leasehold. In short, there is no evidence that BHE's chapter 7 trustee could realize anything in respect of the forage grown on the ranch land.

Even if Mr. Genske's $1 million valuation of the ranch lease were right, unsecured creditors would still receive nothing. Therefore, I find that, in a hypothetical chapter 7 liquidation of BHE's estate, nonpriority unsecured creditors would receive no distribution.

16

## CONCLUSION

The Kea Parties complain that Mr. Sadeghi has gained an unfair advantage because the court has given him priority status for his post-petition loans. This complaint is misplaced. First, the Kea Parties did not appeal the court's orders approving the post-petition financing. Those orders have become final and the liens and priorities that the court approved cannot be modified. § 364(e). Second, and more importantly, Mr. Sadeghi advanced new money to BHE in exchange for those rights, and without Mr. Sadeghi's infusion, BHE would have run out of cash months ago. That would have caused a disorderly shutdown and could have left about 2,200 animals to fend for themselves.

BHE's plan satisfies all applicable requirement for confirmation, including the best interest of creditors test. BHE's counsel shall submit a proposed order confirming the plan.

**END OF MEMORANDUM DECISION**