

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

In re

BOTEILHO HAWAII ENTERPRISES,
INC., dba Cloverleaf Dairy,

      Debtor and
      debtor-in-possession.

Case No.  22-00827

(Chapter 11) (Subchapter V)

<u>Confirmation Hearing</u>
Dates:    June 14, 26, 2023 and
           October 18-19, 2023
Judge:   Hon. Robert J. Faris

[Related to dkt. #83, 197]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER CONFIRMING SMALL BUSINESS DEBTOR'S <u>PLAN OF REORGANIZATION; EXHIBIT "A"</u>

The *Small Business Debtor's Plan of Reorganization* filed herein as docket

number 83 (as supplemented, modified or amended by the Confirmation Order,

together with all schedules and exhibits thereto (the "Plan")),[1] by BOTEILHO

HAWAII ENTERPRISES, INC., the above-captioned debtor (the "Debtor"), came

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- 1 -

on for initial hearings on June 14 and 26, 2023, and an evidentiary hearing on October 18-19, 2023,[2] solely on the issue of whether the Plan satisfies section 1129(a)(7)(A)(i) of the Bankruptcy Code, before the Honorable Robert J. Faris, United States Bankruptcy Judge for the District of Hawaii ("Court"). Appearances were as noted in the record.

Having considered all the pleadings and evidence filed in support of confirmation, all the objections to confirmation of the Plan having been resolved as reflected in the Confirmation Order or otherwise overruled, and based on the record in this case, the arguments and representations of counsel, and good cause appearing, the Court now makes the following Findings of Fact and Conclusions of Law:

## **FINDINGS OF FACT**

1.      BOTEILHO HAWAII ENTERPRISES, INC. is the debtor and debtor-in-possession in Case No. 22-00827, which was commenced with the filing of a voluntary petition for relief under Chapter 11 Subchapter V of Title 11 of the United States Code (the "Bankruptcy Code") in this Court on November 15, 2022 ("Chapter 11 Case").

2.      The Debtor is a "Debtor" within the meaning of section 1182(1) of the Bankruptcy Code.

---

[2] These hearings shall be referred to collectively as the "Confirmation Hearing" and the evidentiary hearing conducted on October 18-19, 2023, shall be referred to as the "Evidentiary Hearing."

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed  11/08/23   Page 2 of 37

3. The Court takes judicial notice of the docket of the Debtor's Chapter 11 Case, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at hearings held before this Court during the pendency of the Chapter 11 Case.

4. On February 21, 2023, the Debtor filed the Plan. *See* dkt # 83.

5. On March 22, 2203, the Court entered that certain *Order Fixing Time for Filing Objections to the Confirmation of the Plan* ("Solicitation Order") which, among other things, (a) set June 14, 2023, as the date for the Confirmation Hearing, and (b) established procedures governing the Confirmation Hearing. *See* dkt # 92.

6. In accordance with the Solicitation Order, the following items were transmitted to creditors and parties in interest: (a) the Plan, (b) the notice of the Confirmation Hearing, and (c) a ballot (if applicable). All of said documents were transmitted to the appropriate parties on or before March 24, 2023, as reflected on the Certificate of Service filed on the docket for this Chapter 11 Case. *See* dkt. ## 95-98. Such service was adequate and proper as provided by the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and no other or further notice is or shall be required.

7. On May 31, 2023, Dutch-Hawaiian Dairy Farms, LLC ("DHDF"), Mauna Kea Moo, LLC ("MKM"), and Kees Kea (collectively the "Kea Creditors") filed their objection to the Plan, including the Declaration of Gary Genske, C.P.A,

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed  11/08/23   Page 3 of 37

and Kees Kea (collectively, the "Kea Objection"). *See* dkt # 106. No other objections to the Plan were filed.

8.     On May 31, 2023, the Office of the U. S. Trustee filed its *Amended Statement Regarding [the Plan]*. *See* dkt. # 105.

9.     On June 7, 2023, the Debtor filed its: (1) *Confirmation Brief Small Business Debtor's Amended Plan of Reorganization*; (2) the *Declaration of Edward Boteilho, Jr. in Support of Confirmation of Small Business Debtor's Plan of Reorganization* (the "Boteilho Declaration"); (3) the *Declaration of Bahman Sadeghi in Support of Confirmation of Small Business Debtor's Plan of Reorganization* (the "Sadeghi Declaration"); and (43) *Declaration of Allison A. Ito Regarding Tabulation of Ballots and in support of Confirmation of [the Plan]* (the "Ballot Tabulation"). *See* dkt. ## 107-110.

10.     The Ballot Tabulation showed that impaired creditors in Class 6 voted to accept the plan in accordance with Section 1126(c). Based on the Ballot Tabulation, no impaired creditors in Classes 2, 3, or 5 voted to accept the Plan, and Classes 2, 3, and 5 are deemed to have rejected the Plan.

11.     On June 13, 2023, Kevin Lam, the Subchapter V Trustee for the Debtor, submitted the *Subchapter V Trustee's Statement Regarding Debtor's Small Business Plan of Reorganization. See* dkt. # 112.

12.     After holding initial hearings on June 14 and 26, 2023, the Court set the

- 4 -

Evidentiary Hearing and entered a Scheduling Order for Evidentiary Plan Confirmation Hearing, setting certain deadlines in connection with the Evidentiary Hearing. *See* dkt. ## 113. 129, 136.

13. Prior to the Evidentiary Hearing, the Debtor filed additional memoranda and declarations in support of Confirmation and supporting documents as reflected in this Court's docket. The Debtor's Exhibits A through P, and R were admitted into evidence during the Evidentiary Hearing without objection.

14. Prior to the Evidentiary Hearing, the Kea Parties also filed additional memoranda and declarations against confirmation of the Plan and supporting documents as reflected in this Court's docket. The Kea Parties' Exhibits 1 through 28 were admitted into evidence during the Evidentiary Hearing without objection.

15. The Subchapter V Trustee also filed a statement regarding the liquidation valuation submitted by the Kea Parties. *See* dkt. # 156.

16. This Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of Court, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Case.

17. To the extent not resolved or withdrawn, all objections to the confirmation of the Plan are overruled in all respects as set forth herein and in the

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed  11/08/23   Page 5 of 37

*Memorandum of Decision on Confirmation of Plan Under Chapter 11 Subchapter V* (the "Memorandum Decision") filed as dkt. 197, and attached hereto as Exhibit "A," which Memorandum Decision is incorporated herein by reference.

### Bankruptcy Code Requirements for Confirmation and Classification

18.     The Debtor has the burden of proving the elements of section 1129 of the Bankruptcy Code by a preponderance of evidence and has done so as set forth herein.

19.     The Plan provides that Administrative Claims will be paid in full, on the later of the Effective Date of the Plan or (if applicable) the date such Administrative Claims are allowed by the Bankruptcy Court.

20.     The Plan designates <u>six</u> Classes of Claims and one Class of Equity Interests.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various classes of claims and Interests created under the Plan.

21.     The Plan specifies that Classes 1 ("insider" secured claim) and 4 (non-insider employee priority claims) are not impaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.  Said Classes are deemed to have accepted the Plan because they are not impaired under the Plan.

22.    The Plan designates that Classes 2 ("insider" secured claim), 3 ("insider" secured claim), 5 (general unsecured class), and 6 (convenience class) are impaired and that Class 7 is unimpaired.  The Plan thus specifies the treatment of Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

23.    Votes to accept and reject the Plan have been solicited from Creditors holding Claims in Class 5 (General Unsecured Class) and in Class 6 (Convenience Class).  Class 5 Creditors were deemed to reject the Plan but were given the opportunity to participate as a Class 6 Convenience Class Creditor.  Such votes were solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Order, and bankruptcy practices.

24.    As set forth in the Ballot Tabulation, Class 6 voted to accept the Plan, pursuant to section 1126(c) of the Bankruptcy Code.  No impaired creditors in Classes 2, 3, or 5 voted to accept the Plan, and Classes 2, 3, and 5 are deemed to have rejected the Plan. [3]

### Treatment of Claims

25.    The Holders of Allowed Secured Claims (Classes 1, 2, and 3) and

---

[3] Creditors holding Claims in Classes 2 and 3 are held by "insiders" of the Debtor.  They did not oppose confirmation of the Plan.

- 7 -

Allowed Priority Unsecured Claims (Class 4) will receive at least as much as they would receive in a case under chapter 7 with respect to those Claims.

26. As more fully set forth in the Opinion, Holders of Allowed General Unsecured Claims (Class 5) will receive under the Plan at least as much as they would receive in a hypothetical liquidation of the Debtor under chapter 7 of the Bankruptcy Code because if the assets of the Debtor were liquidated by a chapter 7 trustee, General Unsecured Creditors would <u>not</u> receive any distribution.

27. Under the Plan, Holders of Allowed Convenience Class Claims in Class 6 (who will receive 30% of such Allowed Claims, subject to a $20,000.00 cap) will receive <u>more</u> than they would receive if the assets of the Debtor were liquidated by a chapter 7 trustee, because if the assets of the Debtor were liquidated by a chapter 7 trustee, Class 6 would <u>not</u> receive any distribution.

28. The treatment of Classes 1, 2, 3, 4, 5, and 6 under the Plan is fair and equitable and the Plan does not unfairly discriminate against any of said Classes.

**Equity Interests**

29. The Holders of Allowed Equity Interests in Class 7 will retain their Equity Interest under the Plan.

30. The Plan provides for the same treatment of each Claim or Equity Interest in each respective Class, unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest,

- 8 -

thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

## Means of Implementation

31.　The Plan provides for adequate and proper means for its implementation through the Debtor's continued operations, and through Bahman Sadeghi's commitment to fund the Plan. *See* dkt # 109 at ¶ 24. The provisions governing the making of distributions and payments, the distribution procedures, mechanisms and proposed allocations are necessary, fair, reasonable and appropriate.

32.　The Debtor has demonstrated adequate assurance of future performance with respect to any assumed executory contracts and leases pursuant to Bankruptcy Code section 365. No party to an executory contract has objected to the Plan or the assumption of any executory contract.

33.　The Debtor has exercised sound and considered business judgment in the formulation of the Plan. The Debtor has demonstrated sound business purpose and justification for the Plan, pursuant to Bankruptcy Code section 363(b).

34.　Any finding of fact subsequently determined to be a conclusion of law shall be deemed a conclusion of law.

35.　This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

36.　This Court has jurisdiction over this Chapter 11 Case, pursuant to sections 157 and 1334 of title 28 of the United States Code. Venue is proper pursuant

U.S. Bankruptcy Court - Hawaii　#22-00827　Dkt # 204　Filed　11/08/23　Page 9 of 37

to sections 1408 and 1409 of title 28 of the United States Code. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Bankruptcy Court has exclusive jurisdiction over all of the Debtor's assets and to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

## Confirmation Requirements

### Non-Consensual Plan: Section 1191(b)-(c) and Section 1129(a)

37. Because Classes 2 ("insider" secured claim), 3 ("insider" secured claim), and 5 (general unsecured creditors) are deemed to reject the Plan, the Plan may be confirmed as a "non-consensual plan" within the meaning of section 1191(b) provided all the requirements of section 1129(a), other than paragraphs 1129(a)(8), (10) and (15), are met, and the plan "does not discriminate unfairly," and is "fair and equitable" with respect to each class of claims of interests that is impaired under, and has not accepted the Plan.

38. The Plan satisfies the requirements for confirmation set forth in sections 1129, 1190 and 1191 of the Bankruptcy Code.

### Section 1129(a)(1)

39. The Plan complies with the applicable provisions of the Bankruptcy Code, as set forth below, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

- 10 -

(a)     The Plan properly places substantially similar Claims and Equity Interests in each Class and designated such Classes of Claims and Equity Interests as impaired or unimpaired, thereby satisfying sections 1122 and 1123(a)(1) of the Bankruptcy Code;

(b)     The Plan specifies the treatment of each Class that is not impaired, thereby satisfying section 1123(a)(2) of the Bankruptcy Code;

(c)     The Plan specifies the treatment of each Class that is impaired, thereby satisfying section 1123(a)(3) of the Bankruptcy Code;

(d)     The Plan provides for the same treatment for each Claim or Interest in a particular Class, unless the holder thereof agrees to a less favorable treatment, thereby satisfying section 1123(a)(4) of the Bankruptcy Code;

(e)     The Plan includes the adoption and implementation of all corporate actions necessary to implement the Plan and the execution of all documents and the implementation of all actions as required with respect to and in accordance with the Plan provisions, thereby satisfying section 1123(a)(5) of the Bankruptcy Code;

(f)     Section 1123(a)(6) of the Bankruptcy Code does not apply to the Debtor or the Plan;

(g)     The Debtor has disclosed the identity of the President, Vice-President, Secretary and Treasurer of the Reorganized Debtor, consistent with

- 11 -

the interests of Creditors, Holders of Equity Interests, and public policy in accordance with section 1123(a)(7) of the Bankruptcy Code;

(h)     The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code; and

(i)     The Plan is dated and identifies the Debtor submitting it as proponent, thereby satisfying Bankruptcy Rule 3016(a).

## Section 1129(a)(2)

40.     The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.

(a)     The Debtor is a proper debtor under section 109 of the Bankruptcy Code;

(b)     The Debtor has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court; and

(c)     The Debtor complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Order in transmitting the Plan, and related documents and notices.

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed   11/08/23   Page 12 of 37

## Section 1129(a)(3)

41.     The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtor's Estate, to satisfy substantial obligations of the Debtor, and to effectuate a successful reorganization of the Debtor.  The good faith of the Debtor is evident from the facts and records of this case, the Plan, the record of the Confirmation Hearing and other proceedings held in this case.

## Section 1129(a)(4)

42.     Any payment made or to be made by the Debtor for services or for costs and expenses in or in connection with the Debtor's Chapter 11 Case, or in connection with the Plan and incident to the Debtor's Chapter 11 Case, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

## Section 1129(a)(5)

43.     The Debtor has complied with section 1129(a)(5) of the Bankruptcy Code.  The identity of the individuals who will serve as President, Vice-President, Secretary and Treasurer of the Reorganized Debtor as of the Effective Date has been fully disclosed.  The appointment to, or continuation in, such offices of such person is consistent with the interests of Holders of Claims against, and Equity Interests in,

- 13 -

the Debtor and with public policy. The identity of any Insider that will be employed or retained by the Reorganized Debtor after the Effective Date and the nature of such Insider's compensation have also been fully disclosed.

## Section 1129(a)(6)

44. Section 1129(a)(6) of the Bankruptcy Code is not applicable to this Debtor.

## Section 1129(a)(7)

45. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. For the reasons set forth in the Memorandum Decision, nonpriority unsecured creditors would receive no distribution in a hypothetical chapter 7 liquidation of the Debtor's estate. *See* dkt. # 197. The First Amended Liquidation annexed as Exhibit A to the *Rebuttal Declaration of Edward Boteilho Jr. In support of Confirmation of [the Plan]* (dkt. # 163): (a) is persuasive and credible, (b) has not been adequately controverted by other evidence, and (c) establishes that each Holder of a Claim or Equity Interest in an impaired Class that has either: (i) accepted the Plan, (ii) not opposed confirmation of the Plan, or (iii) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

- 14 -

## Section 1129(a)(8)

46.     For a Debtor seeking to confirm a non-consensual plan under section 1191(b), the requirements of section 1129(a)(8) of the Bankruptcy Code are not applicable.

## Section 1129(a)(9)

47.     The treatment of the Administrative Claims and Priority Tax Claims under the Plan, as may be modified in accordance with the provisions of the Confirmation Order, satisfies the requirements of Bankruptcy Code section 1129(a)(9).

## Sections 1129(a)(10)

48.     For a Debtor seeking to confirm a non-consensual plan under section 1191(b), the requirements of section 1129(a)(10) of the Bankruptcy Code, which requires that at least one class of impaired claims has accepted the plan, determined without including the acceptance of the plan by any insider holding a claim in such class, need not be satisfied.

## Section 1129(a)(11)

49.     The evidence proffered, adduced, or presented in support of the confirmation of the Plan, both prior to and at the Confirmation Hearing, including the declarations of Edward Boteilho, Jr. (dkt. # 108 and 163) and Bahman Sadeghi (dkt. # 109) (a) is persuasive and credible, (b) is feasible, and (c) establishes that

- 15 -

confirmation and consummation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

50.    In order to satisfy section 1129(a)(11) of the Bankruptcy Code, the Debtor need not prove that there is an absolute certainty that the conditions to confirmation will be met.  On the contrary, the Debtor need only show that the Plan offers a reasonable assurance of success.   The Plan's projections show that Reorganized Debtor will have adequate capital and net operating income to meet its ongoing obligations.  Thus, the Plan has the requisite level of likelihood of success.

### Section 1129(a)(12)

51.    The Debtor's Chapter 11 Case is proceeding under Subchapter V, and as such, the Debtor is not required to pay fees payable under section 1930 of title 28, United States Code, as determined by the Bankruptcy Code.  Thus, the Debtor need not satisfy the requirements of Bankruptcy Code section 1129(a)(12).

### Section 1129(a)(13)

52.    Section 1129(a)(13) of the Bankruptcy Code, which requires a plan to provide for the continuation of payment of all "retiree benefits" does not apply to this Debtor.

### Section 1191(b)-(c):  Non-Consensual Plan does not Discriminate Unfairly and is Fair and Equitable

53.    The Plan satisfies the requirements for confirmation set forth in Section

- 16 -

1191(b) of the Bankruptcy Code.

54.     With respect to Class 2 ("insider" secured claim), an impaired class that did not vote to accept the Plan, and is deemed to reject the Plan, the Debtor's Plan is fair and equitable and complies with Section 1191(c)(1) because the Plan meets the requirements of Section 1129(b)(2)(A) of the Code or Class 2 has otherwise consented to its treatment under the Plan.

55.     With respect to Class 3 ("insider" secured claim), an impaired class that did not vote to accept the Plan, and is deemed to reject the plan, the Debtor's Plan is fair and equitable and complies with Section 1191(c)(1) because the Plan meets the requirements of Section 1129(b)(2)(A) of the Code or Class 3 has otherwise consented to its treatment under the Plan.

56.     With respect to Class 5 (general unsecured creditors), an impaired class that is deemed to reject the plan, the Debtor's Plan is fair and equitable and complies with Section 1191(c)(2) because the Plan devotes all of the Debtor's projected disposable income received in a 3-year period to make payments under the Plan.

**Other Matters**

57.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933.   No governmental agency, with standing, to raise an objection, has, in fact, raised any such objection pursuant to Bankruptcy Code section 1129(d), or sought to deny

- 17 -

confirmation of the Plan on the ground that the principal purpose of the Plan is the avoidance of taxes. Thus, there is strong evidence that the principal purpose of the Plan is not tax avoidance.

58.     Based on the record before the Court in this Chapter 11 Case, the Debtor and its respective employees, officers, members, directors, agents, shareholders, and representatives, and any professional persons employed or formerly employed by any of them, have acted in "good faith" within the meaning of Bankruptcy Code section 1125(e) in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

59.     Each term and provision of the Plan is valid and enforceable pursuant to its terms.

60.     The Debtor has satisfied the requirements of Bankruptcy Code section 365(b)(1) in connection with the assumption of any Assumed Executory Contracts. Each of the Assumed Executory Contracts is an executory contract or an unexpired lease of the Debtor under Bankruptcy Code section 365. All conditions under Bankruptcy code section 365 for the assumption by the Debtor of each Assumed Executory Contract to which it is a party have been satisfied.

- 18 -

61.     The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article 6.4 of the Plan and Bankruptcy Code section 1142. It is appropriate for the Court to retain jurisdiction to: (a) enforce and implement the terms and provisions of the Plan; (b) enforce any Assumed Executory Contracts; (c) enforce the default remedies afforded to creditors under the Plan; and (d) resolve any disputes arising under or related to the Plan.

62.     Pursuant to Bankruptcy Code section 1146(c): (a) any issuance, transfer, or exchange of notes or equity securities under the Plan; or (b) the creation of any mortgage or other security interest in furtherance of, or in connection with, the Plan shall not be subject to any stamp tax, recording tax, conveyance tax, personal property transfer tax, real estate transfer tax, sales or use tax, or other similar tax.

63.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims that all Holders of Claims may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim. The compromise and settlement of such Claims embodied in the Plan, if any, are proper, fair, equitable, and reasonable and in the best interests of the Debtor, the Estate, and all Holders of Claims.

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed   11/08/23   Page 19 of 37

64.    Any conclusion of law later determined to be a finding of fact shall be deemed a finding of fact.

65.    Based on the foregoing findings and conclusions, it is appropriate for the Court to enter the Confirmation Order.

**END OF FINDINGS OF FACT CONCLUSIONS OF LAW**

Submitted by:

CHOI & ITO,
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Tel: (808) 533-1877
Fax: (808) 566-6900
E-mail: cchoi@hibklaw.com
           aito@hibklaw.com

Attorneys for Debtor and Debtor-in-Possession

- 20 -



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>BOTEILHO HAWAII<br>ENTERPRISES, INC.,<br><br>                  Debtor. | Case No.: 22-00827<br>Chapter 11<br><br><br>Related: ECF 83 |

## MEMORANDUM OF DECISION ON CONFIRMATION
## OF PLAN UNDER CHAPTER 11 SUBCHAPTER V

The question presented is whether the subchapter V plan filed by

debtor Boteilho Hawaii Enterprises, Inc. ("BHE"), satisfies the so-called

"best interests of creditors" test under § 1129(a)(7)(A)(i).[1] Based on the

evidence, I hold that it does.

---

[1] Unless otherwise indicated, all citations to sections refer to provisions of the Bankruptcy Code, 11 U.S.C.

BHE filed its plan on February 21, 2023. (ECF 83). Creditors Kees Kea,

Mauna Kea Moo, LLC, and Dutch-Hawaiian Dairy Farms, LLC

(collectively the "Kea Parties") filed objections to confirmation of the plan.

(ECF 106). The court held initial hearings on June 14 and June 26, 2023, and

an evidentiary hearing on October 18 and 19, 2023. Chuck C. Choi, Esq. and

Allison A. Ito, Esq. represented BHE and Frederick J. Arensmeyer, Esq.

represented the Kea Parties.

**LEGAL ISSUE AND STANDARD**

Sections 1191 and 1129 provide that the court may confirm a plan

under subchapter V of chapter 11 ("subV") only if it meets numerous

requirements. The Kea Parties' objection pertains to only one of those

requirements – the "best interest of creditors" test under § 1129(a)(7)(A)(i) –

and I find and conclude that all other requirements are satisfied.

Section 1129(a)(7) provides that the court shall confirm a plan only if:

With respect to each impaired class of claims or interests--
    **(A)** each holder of a claim or interest of such class--
        **(i)** has accepted the plan; or
        **(ii)** will receive or retain under the plan on account
        of such claim or interest property of a value, as of
        the effective date of the plan, that is not less than

2

the amount that such holder would so receive or
retain if the debtor were liquidated under chapter 7
of this title on such date . . . .

A claim is "impaired" unless the plan "leaves unaltered the legal,

equitable and contractual rights" of the claimant (other than curing

defaults and reinstating the claim).  § 1124. BHE's plan provides that

nonpriority unsecured claims, such as the claims of the Kea Parties, will

receive no distribution and will be discharged. (ECF 83 at 2). Therefore, the

Kea Parties' claims are impaired. The Kea Parties have not accepted the

plan. (ECF 110 at 3).

To satisfy the best interests of creditors test, the court looks at a

hypothetical chapter 7 liquidation. *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr.

E.D. Cal. 1997). A hypothetical liquidation "entails a considerable degree of

speculation about a situation that will not occur unless the case is actually

converted to chapter 7." *Id.* The analysis must be based on evidence but "is,

by nature, inherently speculative and is often replete with assumptions and

judgments." *In re PC Liquidation Corp.*, 383 B.R. 856, 868 (E.D.N.Y. 2008).

3

The hypothetical chapter 7 trustee who would conduct the hypothetical liquidation would have to comply with a chapter 7 trustee's statutory duties and powers. 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7](b)(iii) (Richard Levin & Henry J. Sommer eds., 16th ed.). These provisions mean that chapter 7 trustees often must sell property for less than the amount that a private, solvent seller could realize.

The chapter 7 trustee's first duty is to liquidate the estate's property "as expeditiously as is compatible with the best interests of parties in interest." § 704(a)(1). The chapter 7 trustee uses his or her business judgment when disposing of the assets; "[a]lthough a trustee is not compelled to accept any offer to purchase, solely because 'some recovery is better than none at all,' a trustee is required to take appropriate action to liquidate the assets of the estate." *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990). In other words, the trustee must always dispose of the property quickly (although not necessarily at "fire sale" prices).

If selling the property is impossible or disadvantageous, the trustee's only option is to abandon the property under § 554. This means that, unlike

4

a normally motivated private seller, the trustee must either sell the property promptly or give it away for free.

A private party selling business assets may decide to continue operating the business while marketing the assets. A chapter 7 trustee, however, may only operate a business (1) with the court's approval, (2) "for a limited period," and (3) "if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." § 721. Chapter 7 trustees rarely seek and obtain court approval to operate a business. *See In re Quarter Moon Livestock Co., Inc.*, 116 B.R. 775, 782 (Bankr. D. Idaho 1990).

A private seller of assets may decide to spend money, and borrow money if necessary, to improve or rehabilitate the assets in an effort to increase the sale price. But a chapter 7 trustee that is not authorized to operate a business can obtain credit only with court approval. § 364. And, of course, a trustee can borrow money only if the trustee can find a lender who is willing to extend credit to a chapter 7 trustee.

5

**FACTUAL BACKGROUND**

BHE operates a dairy farm and a beef cattle ranch at two separate

locations on Hawaii island. BHE leases both locations from the State of

Hawaii Department of Agriculture.

The lease of the dairy farm provides that the lessee may use the

property solely for "dairying and allied uses." The term of the lease ends in

2041. (ECF 56-2 at 10).

BHE's dairy property is improved with farm buildings and a few

dwellings that house its employees. BHE's facilities and equipment are

outdated and in dilapidated condition. Its dairy herd includes about 1,100

animals, most of which are in poor to fair condition. BHE has bred the herd

using its own bulls. BHE has not used artificial insemination or any

selective breeding techniques. As a result, BHE's herd has become inbred,

has less genetic diversity than is desirable, and is less valuable as a result.

The lease of the cattle ranch similarly limits the lessee's use to cattle

ranching:

> "Pasture" shall mean the conduct of livestock operation
> consisting of the keeping primarily of cattle, and others, in a

6

minor role, such as horses and sheep wherein the animals graze the land for feed produced thereon. Permitted use shall include such compatible uses as woodland management, wildlife management and the cultivation of feed crops to be used strictly within the premises. Excluded will be the operation of commercial activities such as feedlots (excepting a private feedlot designed to feed the Lessee's own cattle), dairy milking parlors, or boarding of horses.

(ECF 56-3 at 83). The lease precludes the lessee from assigning the lease or subleasing without the lessor's consent and provides that the lessor can increase the rent if it approves an assignment or sublease. The lease term ends in about seven years.

The ranch property is largely unimproved. BHE's beef herd of about 1,100 animals is in poor to fair condition and lacks appropriate genetic diversity.

BHE has experienced financial difficulties for many years due to changes in milk pricing, increased competition from milk produced on the continent, increased costs of feed and other supplies, and a prolonged drought that has reduced the amount of forage grown on BHE's properties. BHE's owners began attempting to sell the business in 2010. Those attempts were unsuccessful for many years.

7

In 2020, BHE agreed to sell its dairy operation (including the dairy lease, equipment, and cattle) to the Kea Parties for $700,000. That transaction never closed. (The reasons for the transaction's failure are disputed.)

In the fall of 2022, Bahman Sadeghi bought 85% of the stock in BHE for $600,000. He provided financial support to BHE by buying a $463,926 judgment that a feed supplier had recovered against BHE and advancing $200,000 to BHE as working capital.

BHE filed its bankruptcy petition in December 2022. BHE rejected the purchase contract under § 365, so the Kea Parties no longer have the right to purchase the dairy (although they retain claims for money damages on account of BHE's deemed breach of the agreement). With court approval, Mr. Sadeghi has lent BHE $1 million.

Despite these infusions and a grant of about $52,000 from the U.S. Department of Agriculture, BHE suffered losses of about $437,000 from December 2022 through May 2023, or $87,000 per month. BHE has doubtless incurred additional losses since then.

8

## LEGAL STANDARD APPLIED TO FACTS

*Senior Claims*

Before nonpriority unsecured creditors could receive any distribution, all secured, administrative, and priority claims would have to be paid in full. I find that, in the hypothetical chapter 7 liquidation, senior claims in the following amounts would be paid before there could be any distribution to claims like those of the Kea Parties:

| Priority Claims | Amount |
|---|---|
| Hawi Dairy Acquisition | $ 206,939.84 |
| Logix Capital | $ 200,000.00 |
| DIP Loan | $ 1,000,000.00 |
| **Administrative Claims** | |
| Ch. 7 Trustee Fee | $ 113,458.20 |
| Ch. 7 Trustee's Professionals | $ 50,000.00 |
| Adversary Proceeding | $ 25,000.00 |
| Ch. 11 Professionals | $ 325,000.00 |
| Tax on Sale of Cattle | $ 270,000.00 |
| Priority Tax Claims | $ 2,500.00 |
| Priority Employee Claims | $ 7,575.00 |
| **Total:** | $ 2,200,473.04 |

The Kea Parties dispute only one of these items. Gary Genske, a certified public accountant with impressive experience and expertise in the dairy industry, opined that there would be no income tax consequences

9

from a liquidation of the herds if the sale were "done right." He offered no further explanation. BHE believes that its tax basis in the animals is zero because BHE did not purchase any of the animals and the cost of breeding and raising the animals was treated as an operating expense. Therefore, BHE believes that all sales proceeds of the capital would be taxable income. This explanation is convincing, and I accept it for purposes of this analysis.

*The Dairy Assets*

I find that $700,000 is the maximum amount that a chapter 7 trustee could likely realize for the dairy operation, including the dairy lease, the related improvements and equipment, and the dairy herd.

$700,000 is the price that the Kea Parties agreed to pay for those assets, and that BHE agreed to accept, in 2020. The price set by two parties acting at arms' length is strong evidence of value. Although the agreement was made several years ago, it is nearly inconceivable that the assets have gained value since then: the remaining term of the lease is shorter; the buildings and equipment are older and in worse condition; and the drought and inbreeding continue to erode the value of the herd.

10

Both parties have offered evidence about a possible sale of the dairy animals on the continent. I find that a chapter 7 trustee probably could not accomplish such a sale. In order to do so, the trustee would have to pay the cost of shipping the animals to the mainland. The evidence shows that shipping the animals from Hawaii island to the continent would cost at least 51 cents per pound. (This probably does not include the cost of moving the animals from BHE's property to the port or airport at the point of shipment and from the port or airport at the point of arrival to the place of sale.) Assuming that the animals weigh 500 pounds each on average, the total cost of shipping 2,200 animals would be $561,000.[2] Based on my experience, I find that the shipper would probably require a chapter 7 trustee to pay the freight in advance.[3] As of the end of August 2023, the estate's cash on hand was only about $68,000. The cash balance has surely dwindled since then. Therefore, the hypothetical chapter 7 trustee simply would not have enough cash to sell the animals on the mainland.

---

[2] The average weight of the animals is disputed. Even if the animals weighed only 100 pounds each on average, the cost of shipment would exceed the cash available to the trustee.

[3] There was no evidence that a mainland buyer would be willing to take delivery of the animals in Hawaii or pay or advance the freight costs before delivery.

U.S. Bankruptcy Court - Hawaii  #22-00827  Dkt # 204  Filed  11/08/23  Page 31 of 37

Mr. Yamamura offered opinion testimony that the fair market value of the dairy lease alone was $1,150,000 as of March 30, 2020. I respectfully disagree with his opinion for the following reasons.

First, over three years of the lease term have expired since the effective date of the appraisal. Everything else being equal, a reduction in the remaining term of a lease reduces the value of the lease. There is no evidence of any circumstances in this case that would offset this effect.

Second, Mr. Yamamura prepared his appraisal in connection with the Kea Parties' request for a loan to finance their purchase of the dairy assets. But the appraisal acknowledges that BHE agreed to sell all the dairy assets, not just the lease, for $700,000. The appraisal does not explain how the lease by itself could be worth more than a package of assets that includes the lease and other items.

Third, the appraisal relies primarily on the "income capitalization approach" which "requires the estimation of revenues and expenses from which net income is derived" and then capitalizes the stream of net income to arrive at a valuation. (ECF 143-1 at 27). Yet the appraisal contains no

12

information about the revenues and expenses of the property. Instead, the appraisal (1) estimates the value of the fee simple interest in the property (by looking at comparable sales of other fee simple properties), (2) estimates the fair market rental value of the property by applying a percentage to the fee simple value, (3) subtracting the contract rent from the estimated fair market rent (the "bonus rent"), and (4) calculating the net present value of the bonus rent. This calculation has nothing to do with the actual revenue or actual expenses of operating the property under the terms of the lease. The lessee could only realize the "bonus rent" if it were able to sublet the property at the estimated fair market rent. The dairy lease provides that BHE may not sublease the property without the State's consent, and in the event the lessee subleases the property, the State may revise the rent upwards.

Fourth, and perhaps most importantly, the appraisal represents the appraiser's opinion of the "market value" of the leasehold, "assuming that neither [the buyer nor the seller] is under undue duress." (ECF 143-1 at 6). As I have explained above, the law basically forces a chapter 7 trustee to

sell quickly. A definition of market value that assumes no "undue duress" is not a good fit.

*The Minor Assets*

BHE's liquidation analysis includes as an asset a claim for attorneys' fees against the Kea Parties. For purposes of this analysis, I attribute no value to this claim. The evidence does not permit me to determine, or even predict reliably, whether BHE or the Kea Parties defaulted under the 2020 purchase agreement, or whether BHE could collect an award if it prevailed.

Mr. Genske opined that the liquidation analysis should treat as an asset a $200,000 bond or cash deposit that BHE pledged to its landlord, the Department of Agriculture. I find that, for purposes of this analysis, the bond should not be treated as an asset. The trustee could recover the bond only if the trustee were able to avoid a default under the leases. In light of the minimal cash reserves and continuing massive losses, the trustee may not be able to do so. Even if the trustee were able to sell both leases, a buyer would likely reduce its price to reflect the deposit that it would have to pay.

14

*The Ranch Assets*

In order to generate any return for the Kea Parties and other nonpriority unsecured creditors, the chapter 7 trustee would have to sell the ranch assets for at least $1,500,473.04 (which is equal to the senior claims of $2,200,473.04 minus the $700,000 value of the dairy assets). I find that the hypothetical chapter 7 trustee would not be able to achieve that result.

The evidence of the value of the ranch assets is thin. For the reasons set out above, I find that the chapter 7 trustee could not afford to sell the beef herd on the mainland. Only seven years remain on the ranch lease. BHE has tried to sell its assets, including the ranch assets, since 2010 without success.

The most specific evidence of the value of the ranch assets is Mr. Genske's testimony that the ranch property has a "feed value" of $1 million. According to Mr. Genske, the grass growing on the ranch is worth about $1 million per year. I find, however, that a chapter 7 trustee probably could not realize this value. The trustee or a buyer of the lease could not

15

harvest and sell the feed to someone else for at least two reasons. First, the ranch lease permits "the cultivation of feed crops *to be used strictly with the premises.*" (ECF 56-3 at 83) (emphasis added). Second, most of the ranch terrain is too rough to permit harvesting of the grass. Therefore, the grass on the ranch is probably valuable only to the lessee under the lease. Any sale or sublease of the ranch lease to another rancher would require the Department of Agriculture's consent and there is no evidence about the likelihood that the department would grant its consent. Even if BHE successfully transferred the lease, the Department of Agriculture has the right to adjust the rent to market rate in the event of an assignment, meaning a sale might not result in any bonus value in the leasehold. In short, there is no evidence that BHE's chapter 7 trustee could realize anything in respect of the forage grown on the ranch land.

Even if Mr. Genske's $1 million valuation of the ranch lease were right, unsecured creditors would still receive nothing. Therefore, I find that, in a hypothetical chapter 7 liquidation of BHE's estate, nonpriority unsecured creditors would receive no distribution.

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed  11/08/23   Page 36 of 37

**CONCLUSION**

The Kea Parties complain that Mr. Sadeghi has gained an unfair advantage because the court has given him priority status for his post-petition loans. This complaint is misplaced. First, the Kea Parties did not appeal the court's orders approving the post-petition financing. Those orders have become final and the liens and priorities that the court approved cannot be modified. § 364(e). Second, and more importantly, Mr. Sadeghi advanced new money to BHE in exchange for those rights, and without Mr. Sadeghi's infusion, BHE would have run out of cash months ago. That would have caused a disorderly shutdown and could have left about 2,200 animals to fend for themselves.

BHE's plan satisfies all applicable requirement for confirmation, including the best interest of creditors test. BHE's counsel shall submit a proposed order confirming the plan.

**END OF MEMORANDUM DECISION**

U.S. Bankruptcy Court - Hawaii   #22-00827   Dkt # 204   Filed  11/08/23   Page 37 of 37